NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by email at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

6th Circuit Court-Concord Family Division
Nos.  2022-0329
      2022-0356


IN RE J.R.; IN RE S.R.; IN RE B.R.

Argued: February 23, 2023
Opinion Issued: April 25, 2023


Pearlman Legal Enterprises, of Boston, Massachusetts (David A. Pearlman on the brief and orally), for father.


Sommers Law, PLLC, of Concord (Eric M. Sommers on the brief and orally), for mother.


John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Laura E. B. Lombardi, senior assistant attorney general, on the brief and orally), for the New Hampshire Division for Children, Youth and Families.


DONOVAN, J.  The appellants, father and mother, challenge multiple orders of the Circuit Court (Luneau, J.) (McIntyre, J.) finding that both parents neglected their children and ordering the children's removal from their home. On appeal, mother and father argue that both findings were unsupported by

the evidence. Father also argues that the court's orders failed to provide specific written findings as required by RSA 169-C:6-b, III (2022). We affirm.

## I. Facts

The following facts were found by the trial court or are supported by the record. The appellants are the parents of B.R., S.R., and J.R. Both parents have a significant history with the New Hampshire Division for Children, Youth and Families (DCYF), including reports of concern in both 2015 and 2019 due to allegations that one or both parents were manufacturing or selling methamphetamines in the home with the children present. The 2019 report of concern resulted in the children's removal from the home and neglect findings against both mother and father. In March 2020, the parents and the children were reunified and the case closed.

In October 2020, December 2020, and March 2021, DCYF received three separate reports of concern from the children's school district regarding absences at school. In each case, the school district informed DCYF that it had difficulties contacting the parents to address the attendance issues. Ultimately, DCYF closed each report as either incomplete or unfounded because either it could not investigate the school district's concerns or the mother agreed to engage in services with a third party. Nevertheless, on December 8, 2021, DCYF received another report of concern from the school district regarding each of the children's lack of attendance at school. In the ensuing investigation, DCYF discovered that all three children had been absent or tardy for a significant portion of the 2021-2022 school year. Specifically, by December 8, 2021, B.R. had already missed 43 out of 62 days of the school year.

A child protective services worker (CPSW) contacted the mother and arranged to visit the home on December 13, 2021. Mother informed the CPSW that on November 30, she had enrolled B.R. in six courses through the Virtual Learning Academy Charter School (VLACS) for the purpose of homeschooling the child. She shared a letter of intent to homeschool B.R. with the CPSW and represented that she had mailed it to the school district. On January 20, after the school district refuted mother's homeschooling representation, the CPSW conducted an unannounced home visit. Mother again stated that B.R. was being homeschooled through VLACS courses, but admitted that B.R. was currently only participating in two courses. When asked about her other two children's lack of attendance at school, mother acknowledged that S.R. and J.R. had frequently been absent from or tardy to school and were not engaged in homeschooling.

Between December and February, the CPSW also made repeated attempts to contact father by phone and mail. Despite mother confirming father's phone number and his receipt of the CPSW's letter, father did not

respond to the CPSW. Father was not present for the first home visit and, during the second home visit, mother stated that father was sick and could not speak with the CPSW.

On January 21, the school district — which had access to B.R.'s VLACS account — informed the CPSW that B.R. was not participating in any VLACS courses. The assistant superintendent responsible for the homeschool registration process also informed the CPSW that she had not received a letter of intent from mother to homeschool B.R. On February 4, 2022, DCYF filed neglect petitions against both mother and father alleging educational neglect of all three children. Thereafter, the school district informed the CPSW that on February 5 it had received from the mother a letter of intent to homeschool B.R. On February 9, the trial court held a preliminary hearing on the neglect petition and found that B.R., S.R., and J.R. were "neglected children pursuant to RSA 169-C:3, XIX(b)." The court granted DCYF legal supervision of the children and permitted the children to continue to reside with mother and father with certain conditions, including cooperation with DCYF.

On March 4, DCYF learned from law enforcement that mother had been arrested on February 17 for possession and conspiracy to sell methamphetamine. Mother's arrest resulted from an investigation by state and federal agencies that targeted thirteen individuals in a multi-month, cross-border drug trafficking ring. The CPSW spoke with mother about the arrest. Mother confirmed that she had been pulled over and that law enforcement searched her car, but denied any methamphetamine possession or knowledge of the other twelve individuals identified in the drug trafficking investigation. Thereafter, law enforcement provided the CPSW with the underlying facts surrounding the mother's arrest, and the CPSW had the opportunity to view a video of mother's post-arrest interview with law enforcement. In the interview, mother admitted that on three occasions between November 2021 and February 2022 she purchased an ounce of methamphetamine from a dealer she believed to be associated with a drug cartel. Mother stated that on at least two occasions after she purchased the methamphetamine, she either transported the drugs to her home or had been on her way home prior to being detained by law enforcement. Mother also stated that when she had friends over to her house, they would take the methamphetamine together.

On March 10, the CPSW conducted an unannounced home visit. The CPSW spoke with father, who denied having any knowledge of mother's arrest. Father also assured the CPSW that neither he nor mother used illegal drugs or interacted with anyone involved in the drug trafficking investigation. Mother again denied any involvement in drug trafficking and disavowed her post-arrest admissions to the police. On March 11, based upon the criminal allegations against mother, DCYF filed a motion for ex parte removal of the children from the home. The trial court granted the motion and found that mother's continued involvement in drug trafficking beginning in 2015, and her risk-

3

taking behavior related thereto, "demonstrate that the children's health or life are in imminent danger if they are allowed to remain in the parents' home." The court awarded DCYF protective supervision of the children.

On March 29 and 31, the court held an adjudicatory hearing at which DCYF presented testimony from two counselors from the children's school district and the two CPSWs involved in the investigation. Father testified, but mother did not. At the conclusion of the adjudicatory hearing, the court issued an order finding that both mother and father neglected the children. The court further found that DCYF had made reasonable efforts to prevent the children's removal from the home and that return of the children to the home would be contrary to their welfare. In support of its findings, the court relied upon "the facts and circumstances set forth" in the court's prior ex parte order, DCYF's motion for removal, and the CPSW's affidavit. Accordingly, the court awarded DCYF legal custody of the children with continued out-of-home placement.

In May 2022, following a dispositional hearing, the court found that return of the children to their home would be contrary to their welfare because neither parent had corrected the behavior that led to the children's initial removal. Father and mother each appealed separately. We accepted the two appeals and consolidated them.

## II. Standard of Review

When reviewing final orders in abuse and neglect cases, we will uphold the findings and rulings of the trial court unless they are unsupported by the evidence or tainted by error of law. In re Craig T., 144 N.H. 584, 585 (1999). As the trier of fact, the trial court is in the best position to assess and weigh the evidence before it. Id. Thus, our task is not to determine whether we would have found differently, but, rather, whether a reasonable person could have found as the trial court did. Id.

## III. Analysis

On appeal, both mother and father challenge the sufficiency of the evidence supporting the trial court's findings of neglect. As an initial matter, based upon DCYF's initial petitions for neglect, we construe the court's adjudicatory order as finding, in part, that B.R., S.R., and J.R. were neglected children because they were without proper "education as required by law." RSA 169-C:3, XIX(b) (2022); see State v. Kay, 162 N.H. 237, 242 (2011) ("Our interpretation of a trial court order is a question of law, which we review de novo."). DCYF bears the burden of proving neglect by a preponderance of the evidence. See RSA 169-C:13 (2022). RSA 169-C:3, XIX(b) provides that a "Neglected child" means a child:

4

Who is without proper parental care or control, subsistence, <u>education as required by law</u>, or other care or control necessary for the child's physical, mental, or emotional health, when it is established that the child's health has suffered or is likely to suffer serious impairment; and the deprivation is not due primarily to the lack of financial means of the parents, guardian, or custodian . . . .

(Emphasis added.) <u>See</u> <u>also</u> RSA 169-C:3, XXVII-a (2022) (defining "serious impairment" as "a substantial weakening or diminishment of a child's emotional, physical, or mental health or of a child's safety and general well-being"). As relevant here, when determining the likelihood that a child may suffer serious impairment, the trial court must consider, among other things: (1) "[t]he age and development level of the child"; (2) "[s]chool attendance and performance"; and (3) "[f]indings in other proceedings." RSA 169-C:3, XXVII-a. Moreover, "statutory neglect is not the actions taken or not taken by the parent or parents, but rather it is the likelihood of or actual serious impairment of the child's physical, emotional, and mental well-being that are the conditions of neglect that must be repaired and corrected in the [circuit] court process." <u>In re J.H.</u>, 171 N.H. 40, 49 (2018) (quotation omitted).

Here, mother argues that "[t]he trial court erred in finding that [B.R.] was educationally neglected" based upon a lack of attendance at public school. She maintains that beginning on December 1, 2021, B.R. received home education pursuant to RSA chapter 193-A (2018), and thus was "exempt from compulsory attendance under RSA 193:1." In support, mother relies upon her email to the school district containing a letter of intent to homeschool B.R., which was dated December 1, 2021, but received by the school district on February 5, 2022. Therefore, she argues, it is "axiomatic that a claim for neglect cannot be based on not attending a school where a child is not a student." (Emphasis omitted.) In her view, the petition should have been dismissed because the school district acknowledged that B.R. commenced a home education program as of December 1, 2021, and the record supports that mother remedied any issue of educational neglect through B.R.'s participation in homeschooling courses thereafter. We are unpersuaded.

Even if we credit mother's argument that B.R. commenced a home education program as of December 1, 2021, the trial court considered B.R.'s truancy from public school for the entirety of the 2021-2022 school year. The record supports that prior to December 1, 2021, B.R. missed 37 out of 56 school days with unexcused absences while still enrolled in public school. Indeed, B.R. did not attend public school at all in the month of November, which mother attributed to concerns over "other children's behaviors at school." Moreover, the record demonstrates that, once he was allegedly enrolled in homeschooling after December 1, 2021, B.R. did not consistently participate in the VLACS courses. Specifically, when DCYF filed its neglect petition, B.R. was not participating in <u>any</u> VLACS courses because B.R.

5

dropped four courses, had yet to begin another, and was suspended from the remaining course due to non-participation. Therefore, the evidence before the trial court for the period alleged in DCYF's neglect petition was that B.R.: (1) had been absent for the majority of school days while enrolled in public school; and (2) had not consistently participated in any of the required courses while homeschooled. We conclude that the record supports the trial court's finding that mother neglected B.R. by failing to provide an education as required by law.

Father also argues that the evidence was insufficient to support the trial court's finding that he neglected the children. Specifically, he maintains that his failure to cooperate with DCYF during the educational neglect assessment was the sole basis for the court's decision. Therefore, father argues, the court erred by focusing upon his own actions, as opposed to the likelihood of or actual serious impairment of the children's physical, emotional, and mental well-being. We disagree. As previously discussed, the court found, in part, that B.R., S.R., and J.R. were neglected children because they were without proper "education as required by law." RSA 169-C:3, XIX(b). In support, the court referred to its prior finding in its ex parte order of March 11, 2022, that based upon the testimony of the CPSW, all three children had been absent or tardy for a significant portion of the 2021-2022 school year.

As a custodial parent, father shared with mother equal responsibility to provide his children with an education as required by law. See RSA 169-C:3, XVII(d) (2022) (defining legal custody as including "[t]he responsibility to provide the child with . . . education"); RSA 169-C:3, XIX(b). Contrary to father's argument, the court's reference to father's failure to engage with DCYF during the educational neglect assessment was not the sole finding supporting the court's order. Rather, the court found that father, as a custodial parent, failed to fulfill his duty to provide the children with an education as required by law, and that his lack of engagement with DCYF to correct his children's truancy constituted an additional factor supporting that determination. See RSA 169-C, XIX(b). Accordingly, we conclude that the record supports the court's finding of neglect as to father.[1]

Mother and father further contend that the trial court erred in finding educational neglect as to B.R. because DCYF admitted that it did not follow its own internal policy before conducting its educational neglect assessment. Specifically, both parents rely upon DCYF internal policies that require DCYF intake staff to first initiate a voluntary children in need of services (CHINS) case before beginning an educational neglect assessment when screening cases of

---

[1] We also note that DCYF's neglect petition alleged that the children's truancy occurred during the 2021-2022 school year, when the school district had returned to in-person instruction. We therefore reject father's argument that the children's truancy can be attributed to the difficulties of tracking student attendance during the remote learning period of the COVID-19 pandemic.

educational neglect "for youth 14 years of age and older." In mother's view, because DCYF admitted that it did not follow this policy in this instance, "[i]t is not reasonable for a court to find educational neglect" based upon facts from the ensuing educational neglect assessment.

However, neither parent cites persuasive authority for the position that DCYF's failure to follow its own internal policy in conducting an educational neglect assessment precludes the circuit court from finding educational neglect based upon evidence gathered during the assessment. Gallo v. Traina, 166 N.H. 737, 740 (2014) (the appealing party has the burden of demonstrating reversible error). Instead, we agree with DCYF that a court's determination of neglect is defined exclusively by statute in RSA chapter 169-C and our case law interpreting that chapter. Indeed, crediting this argument that a court must deny a petition for neglect when DCYF does not follow its own internal policies would, in effect, add language to the statute that the legislature did not see fit to include. State v. Pinault, 168 N.H. 28, 31 (2015) ("[W]e interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language it did not see fit to include.").

Mother and father also argue that the trial court erred in finding neglect and ordering the removal of the children based upon the criminal charges against mother. The relevant statutory framework provides that, if the court finds that a child is abused or neglected, the court may order that legal custody be transferred to a child placing agency. RSA 169-C:19, III(a). The primary purpose of RSA chapter 169-C is "to provide protection to children whose life, health or welfare is endangered." RSA 169-C:2, I. Moreover, "[t]he best interest of the child shall be the primary consideration of the court in all proceedings under this chapter." Id. As relevant here, RSA 169-C:18 provides, in part:

> If a preliminary order provided for an out-of-home placement of the child, the child shall not be returned to the home unless the court finds that there is no threat of imminent harm to the child and the parent or parents are actively engaged in remedial efforts to address the circumstances surrounding the underlying petition.

RSA 169-C:18, V-c (emphasis added); see also RSA 169-C:23.

Here, the court granted DCYF's initial motion for ex parte removal of the children. The court found that both parents' "extensive history with DCYF," related to "continued involvement in drug trafficking," supported the conclusion that the children's health or life would be in imminent danger if they were allowed to remain in the parents' home. Thereafter, the court found in both its adjudicatory and dispositional orders that returning the children to their parents' home would be contrary to their welfare. Specifically, the court determined that neither parent had engaged in remedial efforts to address the

7

circumstances that led to the children's initial removal from the home. The court reasoned that mother "still has not acknowledged the admissions she made to police" concerning her arrest for drug trafficking and "maintains that even if true, this conduct has nothing to do with her children." Likewise, the court found that father's "behavior also remains unchanged in that he continues to ignore DCYF's attempts to contact him . . . instead choosing to remain uncooperative and disengaged." The court further found that father "has not put forth any effort to address the conditions that led to the children's removal from [the] home."

Mother and father both argue that the court erred in ordering removal of the children because the evidence was insufficient to demonstrate "that the children had suffered or were likely to suffer serious impairment if left in the home." Specifically, mother argues that DCYF presented no evidence that the "children had any contact with drugs, that there was a pervasiveness of drugs in the home (or any for that matter), or that those conditions were continuing an[d] ongoing." (Emphasis omitted.) Instead, mother argues, based upon the criminal charges against her, "DCYF asked the court to infer" that mother was currently using or selling drugs and that they were in her home. Likewise, father argues that "there was no evidence that [mother's] criminal charges adversely affected the children or placed them at risk, nor any evidence whatsoever that [father] posed any risk, present or future." We disagree.

Based upon mother's post-arrest interview with law enforcement, concurrent with the children's truancy, mother purchased an ounce of methamphetamine on three occasions between November 2021 and February 2022. The CPSW testified that on one occasion mother transported the methamphetamine back to her home and, on another occasion, she was on her way home with the drug prior to being detained by the police. Mother also admitted that her drug source was associated with a "cartel" and had previously approached her about taking over distribution. Further, during her interview mother stated that she used the drug with friends when they came to her home. The court, when considering the ongoing risk of harm to the children, also referenced both parents' prior history of manufacturing and selling drugs. See RSA 169-C:3, XXVII-a (requiring court to consider prior neglect findings in determining the likelihood that a child may suffer serious impairment). This history included a prior neglect and removal order against both parents based upon substantially similar conduct involving drug trafficking in 2019, as well as, in the instant case, mother purchasing an ounce of methamphetamine from the same supplier despite law enforcement previously confronting her with being involved in a drug ring.

Moreover, after the court granted DCYF's motion for ex parte removal of the children, neither mother nor father engaged in necessary remedial efforts to address the circumstances that led to the children's removal. See RSA 169-C:18, V-c. Throughout the proceedings, the court found that mother refused to

acknowledge her admissions to law enforcement concerning drug trafficking and disputed how those actions related to her children.  With respect to father, the court found that, after he ignored DCYF's efforts to contact him during the educational neglect assessment, he denied any knowledge of mother's criminal activity or of any involvement with illegal drugs.  Ultimately, although mother did submit to drug testing, with a negative result, neither parent engaged with DCYF to ensure that the children resided in a home free from the presence of drugs, but, rather, continued to deny that any such conduct had occurred.

Accordingly, we conclude that the dangers associated with mother's continued involvement in drug trafficking, in addition to the court's prior finding of educational neglect, supported the court's determination of imminent harm to the children and their removal from the home.  Although we recognize that the basis of the imminent harm to the children stemmed from the criminal allegations against mother, father, as a custodial parent, shared equal responsibility and failed to protect the children from that imminent harm.  See RSA 169-C:3, XVII (c) (defining legal custody as including "[t]he right and the duty to protect" the child).  Moreover, both parents' failure to engage in remedial efforts to correct the conditions that caused the children's initial removal support the court's findings in its subsequent orders that the children's return to the home would be contrary to their welfare.  See RSA 169-C:18, V-c.

Father next challenges the court's removal order by asserting that the court erred "when it failed to provide specific written findings for the neglect and out-of-home placement determinations" against him.  Father concedes that he failed to preserve this issue for appeal, but argues that the trial court committed plain error.  See Sup. Ct. R. 16-A.  To find plain error: (1) there must be error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity, or public reputation of judicial proceedings.  State v. Hanes, 171 N.H. 173, 182 (2018).  The plain error rule is used sparingly, however, and is limited to those circumstances in which a miscarriage of justice would otherwise result.  Id.  We conclude that father has failed to establish that the trial court committed plain error.

RSA 169-C:6-b, III provides that if the court orders a child's removal from his or her home, "the court order for removal shall include specific written findings regarding the need for the out-of-home placement."  In addition, "[t]he order shall briefly state the facts the court found to exist that justify ordering the placement."  RSA 169-C:6-b, III.  Here, father argues that the court's adjudicatory and dispositional orders did not provide specific written findings about his own conduct and instead "merely alluded to broad, non-specific concerns" of his lack of engagement with DCYF.  Specifically, father appears to argue that the court's adjudicatory order, incorporating by reference its prior findings in its ex parte removal order, did not constitute specific written

findings as required by RSA 169-C:6-b, III.[2]  In his view, the court erred in this regard because "[r]eferencing other documents in a vague, wholistic manner does not constitute a specific written finding by the court."

To the contrary, the court's ex parte order of March 11, 2022, which ordered the children's initial removal from the home, included multiple written findings, including: (1) the children's truancy; (2) both parents' history of involvement with DCYF for prior instances of drug trafficking; (3) mother's admissions to law enforcement and the facts underlying her most recent arrest for drug trafficking; and (4) both parents' similar denials of any knowledge of the circumstances underlying mother's arrest.  The court then found that these findings "demonstrate that the children's health or life are in imminent danger if they are allowed to remain in the parents' home." (Emphasis added.) Therefore, the court did not rely solely upon father's lack of engagement with DCYF.  Rather, the court found that, as a custodial parent, father failed to protect the children from imminent harm in the collective "parents' home."  See RSA 169-C:3, XVII(c) (defining legal custody as including "[t]he right and the duty to protect" the child).  We conclude that when properly considering the trial court's reference to father's failure to fulfill his duties as a custodial parent, the court's initial ex parte removal order included specific written findings as required by RSA 169-C:6-b, III.

In the court's subsequent adjudicatory order that same month, in support of its removal finding, the court incorporated by reference the same findings articulated in its ex parte order.  Based upon its incorporation by reference of its prior ex parte order, we conclude that the court's adjudicatory order made "specific written findings regarding the need for the out-of-home placement" and stated sufficient facts to justify ordering that placement.  RSA 169-C:6-b, III.  Father appears to argue that based upon our holding in In re G.B., 174 N.H. 575 (2021), the court's incorporation by reference of its prior ex parte order was insufficient.  Nothing stated in In re G.B. precludes a court from incorporating by reference a prior order to satisfy the requirement that it provide specific written findings pursuant to RSA 169-C:6-b, III.  See In re G.B., 174 N.H. at 582-83.

Father further argues that the trial court committed plain error in its dispositional order by failing to include sufficient written findings as required by RSA 169-C:6-b, because it only "alleged lack of engagement and cooperation with DCYF."  We need not decide whether RSA 169-C:6-b requires specific written findings in the initial "court order for removal" or, as father argues, in

---

[2] To the extent that father argues that the court's neglect findings in the adjudicatory order are not specific written findings, RSA 169-C:6-b, III requires specific written findings regarding only the need for out-of-home placement, not regarding whether the child has been neglected.  To the extent that father challenges whether the evidence itself is sufficient to support a finding of neglect, we address these arguments elsewhere in our opinion.

any subsequent orders that continue an out-of-home placement. Crediting father's argument would, arguably, render superfluous the requirement in RSA 169-C:18, V-c, that a court order that continues an out-of-home placement "shall include the facts supporting the placement." See Pinault, 168 N.H. at 916 ("[W]e interpret a statute in the context of the overall statutory scheme and not in isolation."). Given our prior conclusion that the trial court's initial removal order contained specific written findings, we conclude that father has failed to demonstrate that any error the trial court may have committed in its dispositional order constitutes a "plain error."

Finally, mother argues that the trial court erred in finding that DCYF made reasonable efforts to prevent the children's removal. RSA 169-C:6-b, II provides that "[t]he court shall within 60 days of a child's removal from the home, determine and issue written findings as to whether reasonable efforts were made or were not required to prevent the child's removal." When "determining whether reasonable efforts were made to prevent the child's removal, the court shall consider whether services to the family have been accessible, available, and appropriate." RSA 169-C:6-b, II. Here, mother complains that DCYF did not perform a search of the home prior to filing its ex parte motion for removal of the children. Regardless, DCYF engaged with law enforcement and obtained all of the information relating to the circumstances surrounding mother's arrest, which included the probable cause statement by the officer who seized mother's car, a redacted copy of the police report, and her post-arrest interview. DCYF then spoke to each parent about the underlying allegations and, contrary to mother's previous admissions to law enforcement, each parent denied the allegations. Based upon the parents' refusal to even acknowledge the existence of the drug trafficking investigation or the risks posed to the children by mother's alleged conduct, we conclude that the record supports the trial court's determination that reasonable efforts were made by DCYF to prevent the children's removal from the parents' home.

Affirmed.

MACDONALD, C.J., and HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.

11